# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

MEGAN LYNN MOHR GARCIA, )
)
Plaintiff, )
)
v. ) C. A. No. 18-1123-MPT
)
CAROLYN W. COLVIN )
Acting Commissioner of )
Social Security, )
)
Defendant. )

## MEMORANDUM

## I.    INTRODUCTION

This action arises from the denial of Plaintiff's claim for Social Security benefits.

On July 31, 2013 and August 15, 2013 respectively, plaintiff filed applications for Social

Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act

(the "Act") and Supplemental Security Income ("SSI") under Title XVI of the Act.[1]

Plaintiff alleges disability as of October 20, 2009, after several periods of leave through

the Family Medical Leave Act ("FMLA") from her then-employer, Comcast Cable

Communications ("Comcast").[2]  In her applications, she claimed several disabling

medical conditions, among them depression, anxiety, bipolar disorder, attention deficit

hyperactivity disorder ("ADHD"), anger control/impulse issues, herniated discs,

---

[1] D.I. 15-5 at 234, 236.
[2] Id. at 234; D.I. 15-2 at 44-46.

FILED

JUL 2 4 2019

U.S. DISTRICT COURT DISTRICT OF DELAWARE

degenerative disc disease, Poland syndrome, arthritis, headaches, and blurry vision.[3]

Plaintiff's Title II application was initially denied on September 16, 2013; her Title XVI application was denied on April 10, 2014.[4] Both applications were denied again upon reconsideration on July 16, 2015.[5] On September 8, 2015, Plaintiff requested a review of her applications before an Administrative Law Judge ("ALJ") and on April 13, 2017, a hearing occurred before ALJ C. Howard Prinsloo.[6] At the hearing, testimony was given by Plaintiff and an impartial vocational expert, Ray O. Burger (hereafter referred to as "Burger").[7] On June 12, 2017, ALJ Prinsloo issued a written decision denying plaintiff's claims for a third time.[8]

Plaintiff sought review of the ALJ's decision by the Social Security Appeals Council, but her request was denied on June 12, 2018.[9] Plaintiff then filed a timely appeal with this court on July 31, 2018.[10] Presently before the court are the parties' cross-motions for summary judgment. For the reasons that follow, it is recommended that Defendant's motion be granted.

## II.  BACKGROUND

Plaintiff was born on November 23, 1997.[11] She has a high school education and recent past work experience at Comcast, where she worked for over thirteen years

---

[3] D.I. 15-4 at 140, 145.
[4] *Id.*
[5] *Id.* at 153.
[6] *Id.* at 160-161; D.I. 15-2 at 39.
[7] D.I. 15-2 at 39.
[8] *Id.* at 23-34.
[9] *Id.* at 1.
[10] D.I. 2.
[11] D.I. 15-2 at 43.

in a variety of positions, including cashier and warehouse worker.[12] At the time of her disability applications, plaintiff was thirty-one years old.[13] She is now thirty-nine years old and has not worked full-time since 2009.[14] She presently lives in Wilmington, Delaware with her husband and two teenage children.[15]

Plaintiff has a history of back, neck, and shoulder pain, in addition to anxiety and depression.[16] In view of her concurrent applications for Title II and Title XVI benefits, the ALJ's discussion focused primarily on medical evidence from the period beginning October 20, 2009.[17] Evidence outside this period was considered for context only.[18]

While Plaintiff alleged a number of physical and mental impairments, the ALJ found only the following four to be severe: degenerative disc disease, degenerative joint disease, anxiety, and affective disorder.[19] Despite these impairments, the ALJ determined that from October 20, 2009 to October 12, 2015, Plaintiff possessed the residual functional capacity ("RFC") to perform light work with limitations.[20] The ALJ then determined that from October 13, 2015 to the date of his decision, plaintiff retained the RFC to perform sedentary work with limitations.[21] The bifurcated RFC accounts for an alleged worsening of Plaintiff's condition as she awaited spinal surgery to address

---

[12] *Id.* at 44.
[13] D.I. 15-3 at 26.
[14] D.I. 15-2 at 43, 45, 61.
[15] D.I. 15-5 at 237.
[16] D.I. 15-2 at 19, 21.
[17] *Id.* at 12.
[18] *Id.*
[19] *Id.* at 15.
[20] D.I. 15-2 at 17.
[21] *Id.* at 24.

3

her back issues. Surgery was planned for May 10, 2017, a month after the hearing.[22]

To be eligible for disability benefits, Plaintiff must not only demonstrate she is disabled with the meaning of §§§ 216(I), 223(d), and 1614(a)(3)(A), but additionally, that she meets the insured status requirements of §§ 216(I) and 223.[23] Plaintiff has met the requirements for coverage under §§ 216(I) and 223, and her earnings records show she has acquired sufficient quarters of coverage to remain insured through December 31, 2016.[24] The remaining issue, therefore, is whether Plaintiff is disabled under the Act.

## A.    Evidence Presented

Plaintiff allegedly suffers from both physical and mental health issues which she asserts renders her disabled and unable to be or remain gainfully employed. Plaintiff provided numerous medical records from her healthcare providers including treatments, procedures, office visit notes, and medical opinions that date from February 2010 through February 2017. In review of the record the ALJ found Plaintiff possessed the ability based on residual functional capacity (RFC) to perform sedentary level tasks and employment.[25]

### 1. Physical Impairments

From August 2009 to November 2009, Plaintiff was seen at First State Orthopedics for pain in her left shoulder and wrist.[26] She stated that her left shoulder

---

[22] *Id.* at 40.
[23] *Id.* at 12.
[24] D.I. 15-2 at 12.
[25] *Id.* at 27-28.
[26] D.I. 15-5 at 832-836.

4

pain began in June 2009, but was gradually getting worse.[27] Physical examination revealed some range-of-motion limitation in her neck and resulting pain in the scapula, but no abnormalities of the wrist.[28] An initial assessment of cervical radiculopathy was made.[29] An MRI of her left shoulder and cervical spine taken in October 2009 showed mild subacromial bursitis and some tendinopathy of the supraspinatus tendon, although there was no evidence of a rotator cuff tear or other pathology.[30] Plaintiff was subsequently referred to Dr. Moran at the First State Spine Center for treatment.[31]

In February and March 2010, plaintiff received cervical epidural and facet joint injections under the direction of Dr. Moran.[32] Plaintiff "tolerated the procedure[s] well without any complications."[33] In April 2011, Dr. Moran referred Plaintiff for a consultation at Premier Orthopaedic & Sports Medicine Associates.[34] At that point in time, Plaintiff was complaining of chronic right shoulder pain that worsened with overhead movement.[35] She had previously received "extensive physiotherapy" and cortisone injections to no avail.[36] After additional cortisone injections provided only temporary relief, it was recommended that Plaintiff undergo an arthroscopy, which was completed in July 2011.[37] Plaintiff recovered well from surgery and achieved full active

[27] Id. at 832.
[28] Id.
[29] Id.
[30] D.I. 15-5 at 836.
[31] Id.
[32] D.I. 15-9 at 449, 455.
[33] Id.
[34] D.I. 15-11 at 527.
[35] Id.
[36] Id.
[37] Id. at 525, 522.

5

forward flexion and abduction to 120 degrees twelve days after the procedure.[38]

An MRI of Plaintiff's left shoulder in May 2011 revealed an impingement on the musculotendinous junction of the supraspinatus muscle, capsular stripping with displacement of the anterior labrum, a possible tear of the superior labrum, and a complete tear in the supraspinatus tendon.[39] These issues were addressed in the July 2011 arthroscopy.

An MRI of Plaintiff's left shoulder in March 2013 showed a tiny full thickness rotator cuff tear.[40] There were no follow-up notes or recommendations.

An MRI of Plaintiff's lumbar area in May 2013 revealed five ribless vertebrae with a slight dextroscoliosis in the lower lumbar region. The report indicated there was decreased disc space height at L4-5 and L5-S2. There was no evidence of listhesis. Recommendations based on the findings were for additional injection procedures and fusion surgery.[41]

In June and July 2013[42] Plaintiff received a lumbar epidoral steroid injection in L4-5 in the lumbar region. She tolerated the procedures well and was recommended to apply ice to the area for twenty minutes each time. She was instructed to follow-up with an office visit. Plaintiff suffered no complications as a result of these procedures, however she reported her symptoms were unchanged. Post-op notes reveal that medication was "helping her remain somewhat functional."[43]

---

[38] D.I. 15-11 at 522.
[39] *Id.* at 520.
[40] *Id.* at 521.
[41] D.I. 15-12 at 597.
[42] *Id.* at 565-66.
[43] *Id.*

6

On April and May 2015, Dr. Patel administered nerve root injections at L5 and S1 for pain management and function improvement.[44] He also administered Diagnostic Lumbar medical branch blocks on L3, L4, L5, and S1.[45] Plaintiff was discharged each time with instructions for after-procedure care. Plaintiff was also routinely prescribed Morphine Sulfate ER and Percocet for pain management between visits.[46]

In June 2015, Dr. Patel administered Diagnostic Lumbar branch blocks on L3, L4, L5, and S1 for pain management and function improvement.[47] She was discharged with instructions for after-procedure care. Notes also state that Plaintiff was recommended to schedule Physical Therapy, which she refused because she preferred to do exercises at home.[48]

In June 2015, Dr. Pedro A. Saez from Delaware Disability Determination Service completed a Pyschological Functional Capabilities Evaluation Form on Plaintiff.[49] The evaluation indicated that Plaintiff had an estimated moderate degree of impairment for: ability to relate to other people, restriction of daily activities, deterioration of personal habits, constriction of interests, carrying out instructions under ordinary supervision, sustained work performance and attendance in a normal work-setting, and coping with pressures of ordinary work, noted as meeting quality and production norms. Plaintiff had a mild impairment for understanding simple, primarily oral instructions, and performing routine, repetitive tasks under ordinary supervision. Dr. Saez also opined

---

[44] D.I. 15-14 at 675, 677.
[45] *Id.* at 680.
[46] *Id.* at 678.
[47] *Id.* at 686.
[48] *Id.* at 681.
[49] D.I. 15-13 at 658-59.

that Plaintiff was capable of managing money.

Dr. Saez also completed a detailed Clinical Psychological Evaluation on Plaintiff.[50] Areas explored included social/developmental history, medical history, psychiatric history, daily activities, behavioral observations, and a mental status exam. Dr. Saez diagnostic impressions were of Major Depressive Disorder, PTSD, ADHD, Pain Disorder, Poland Syndrome, arthritis, disk herniations, back pain, lack of daily structure, occupational problems, economic problems, and a GAF[51] score of 59. His prognosis was fair to good. He stated Plaintiff should continue ongoing treatment for depression and anxiety to improve functioning. He also indicated Plaintiff would likely improve over a 6-12 month period, and would benefit from vocational rehabilitation to address job-related skills deficits and attain assistance with employment. Dr. Saez's report indicated that Plaintiff possessed moderately limited capacity for performing various job functions including understanding, carrying out and remembering instructions, responding appropriately to supervision, co-workers, and work pressures in a work setting on a psychological basis due to pain, anxiety, ADHD, and depression.

In July 2015, Dr. Josette Covington from Delaware Disability Determination Service completed a report on Plaintiff.[52] Her report indicated that no medical records were provided for review, so that the entire medical history, medications, family and

---

[50] *Id.* at 660-663.

[51] Global Assessment of Functioning (GAF) scores measure how much a person's psychological symptoms impact their daily life. The scale ranges from 0 to 100 and is often used in VA assessments of the severity of a veteran's psychological disorder. A score of 59 indicates moderate symptoms, or moderate difficulty in social, occupational, or school functioning.

[52] *Id.* at 666-673.

8

social history contained therein came solely from Plaintiff. Dr. Covington's diagnoses were 1) pain in the back and neck, not otherwise specified; 2) history of Poland syndrome; and 3) bipolar disorder and anxiety. Dr. Covington opined that Plaintiff, in an 8-hour work day, with usual and customary breaks, is capable of medium-duty work with no lifting, pushing, or pulling over fifty pounds. She further noted that Plaintiff be limited to occasional walking, standing, and climbing, and was capable of using her right hand for occasional lifting, pushing, pulling, and grasping.

In July 2015, Dr. Patel administered trigger point injections and a right sacroiliac injection.[53] In August 2015, he administered a left sacroiliac injection.[54] Plaintiff tolerated both procedures well and she was discharged with after-care instructions. Plaintiff was prescribed Morphine Sulfate ER and Percocet for pain management. Physical therapy was again recommended, however Plaintiff again declined since she preferred exercising at home.

In September 2015, a CT Scan of the Lumbar Spine Without Contrast was performed. The report indicated scoliosis of the lumbar spine with convexity to the right, with no loss in height of lumbar vertical bodies, and no significant disk protusions identified at T12-L1, L1-L2, or L2-L3.[55] Final impressions revealed that there was a grade 4 annular tear at L3-4, and grade 5 annular tears at L4-L5 and L5-S1.[56]

In October 2015, an MRI of the lumbar spine with and without contrast revealed a new large central and left-sided L5-S1 disk herniation with associated epidural

---

[53] D.I. 15-14 at 694.
[54] *Id.* at 697.
[55] D.I. 15-15 at 837.
[56] *Id.*

9

hematoma/inflammatory tissue severely compressing the thecal sac and the left S1 root.[57] The findings were noted as consistent with Plaintiff's left radicular symptoms.[58]

Subsequently, in June 2016, Dr. Patel administered right lumbar branch blocks on L3, L4, L5, and S1 for pain management and function improvement.[59] Plaintiff was discharged with instructions for after-procedure care. Dr. Patel noted that Plaintiff's overall condition was worsening.

Dr. Patel completed a Physical Residual Functional Capacity Questionnaire on Plaintiff in November 2016. He opined Plaintiff's symptoms would frequently interfere with her ability to focus and concentrate to perform tasks and that she was capable of handling low-stress jobs. Further, Plaintiff could sit for 4.5 hours or stand for 1.5 hours every six hours with normal breaks. Dr. Patel noted that Plaintiff needed surgery and thereafter could return to full time work. The November 2016 opinion also shows marked improvement compared to Dr. Patel's November 2015 report.[60]

In January 2017, Plaintiff began physical therapy with therapist Erwin Buenasteda. In his initial assessment on 1/24/2017, he opined that Plaintiff's rehab potential and prognosis as good.[61] The initial plan was for Plaintiff to have three visits per week for four weeks for a total of twelve visits. Plaintiff attended only one visit on 1/26/2017.[62] After these two visits, Buenasteda completed a Physical Abilities Assessment on 2/6/2017 which opined that Plaintiff could sit, walk, or drive

---

[57] *Id.* at 830.
[58] *Id.*
[59] D.I. 15-14 at 769.
[60] D.I. 15-15 at 839-842, 843-46.
[61] D.I. 15-15 at 848.
[62] *Id.* at 851.

occasionally, and stand occasionally/frequently.[63]  Further, he concluded that repeated arm motions, repetitive use of wrists/hands, reaching up above the shoulder level, and foot controls were all tasks that Plaintiff could perform frequently, but noted the number of hours she could work each day as zero.[64]

Dr. Candice Paul completed a medical opinion on Plaintiff's ability to perform work-related physical activities in February 2017.[65]  On nearly every form, Dr. Paul advised that she had only evaluated Plaintiff one time, and deferred recommendations on treatment and restrictions to Plaintiff's previous provider[s].[66]

Also, in February 2017, Dr. Alexia Moutsatsos completed a medical opinion regarding the Plaintiff's ability to perform work-related physical activities in.[67]  Dr. Moutsatsos found Plaintiff unable to balance, stoop, kneel, climb, or crouch, and was restricted to lifting 5 pounds and sitting a total of four hours, but no longer than 1-2 hours without a break, and walking less than 100 feet.[68]  Dr. Moutsatsos opined that Plaintiff was unable to perform sedentary or light work.[69]

### 2. Mental Health Impairments

Plaintiff has been under the care of Dr. Manisha Wadhwa for mental health concerns since September 2012.  Dr. Wadhwa initially diagnosed Plaintiff with Bipolar Disorder NOS, Panic Disorder with Agoraphobia, and Post-Traumatic Stress Disorder.[70]

---

[63] *Id.* at 854.
[64] *Id.*
[65] *Id.* at 860-61.
[66] *Id.*
[67] *Id.* at 862-63.
[68] *Id.*
[69] *Id.*
[70] D.I. 15-11 at 536.

She later diagnosed Attention-Deficit/Hyperactivity Disorder, inattentive type.[71]  Plaintiff

was prescribed a myriad of medications for her diagnoses including aripiprazole,

buspirone, escitalopram, lisdexamfetamine,[72] abilify, clonazepam,[73] strattera, concerta,

buspar;[74] adderall, trazodone, sertraline;[75] vilazodone,[76]  effexor, prozac,[77] and

fetzima.[78]  Dr. Wadhwa observed that Plaintiff was well-oriented in all spheres, alert,

neatly or appropriately dressed, well-groomed, with recent and remote memory

unimpaired, cooperative, interested, and demonstrated good judgement.[79]  Regarding

Plaintiff's attention span, Dr. Wadhwa noted "an ability to attend and maintain focus"[80]

to "poor attention span"[81] to "poor attention span in the evenings."[82]

## B.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the administrative hearing on April 13, 2017 Plaintiff testified about her

background, work history, and alleged disability.[83]  She is thirty-nine years old and lives

with her husband and two children in Wilmington, Delaware.[84]  Plaintiff's husband

---

[71] D.I. 15-12 at 610.
[72] D.I. 15-11 at 534.
[73] *Id*. at 536.
[74] *Id*. at 541.
[75] D.I. 15-13 at 622-23.
[76] *Id*. at 638.
[77] *Id*. at 646.
[78] *Id*. at 651.
[79] D.I. 15-11 at 536-543.
[80] *Id*. at 536-39.
[81] *Id*. at 540-41.
[82] *Id*. at 542.
[83] D.I. 15-2 at 43-68.
[84] *Id*. at 43-44.

operates his own auto transport business.[85]  Plaintiff has a high school education.[86]
She last worked full time in 2009 for Comcast, both in the call center and the
warehouse.[87]  Plaintiff's job responsibilities included cashiering, managing inventory,
answering phones, and lifting boxes up to roughly thirty pounds when distributing
equipment.[88]  She attempted to work for her husband's business from home by
scheduling jobs and invoicing, but was unable to continue.[89]  Plaintiff testified that she
could not concentrate, stating that she "just messed everything up."[90]  Plaintiff has not
sought work because of back problems, anxiety, and depression.[91]

Plaintiff described her pain is severe across her back, radiating into her left
buttock, down to her feet.[92]  This pain caused weakness in her legs, with difficulty
walking, standing, sitting, and lifting.[93]  Plaintiff also testified that she experiences
problems with her left shoulder "but right now my focus is my back."[94]

Plaintiff has a history mental health issues of anxiety, depression, ADHD, OCD,
and PTSD, for which she receives treatment for from Dr. Wadhwa of Harmonious
Minds.[95]  She claims problems with leaving her house and frequently needs to be driven
to places.  Her parents and son help with grocery shopping.[96]  Her children assist with

[85] *Id.* at 44.
[86] *Id.* at 43.
[87] *Id.* at 44-46.
[88] *Id.*
[89] *Id.* at 61.
[90] *Id.*
[91] *Id.* at 46.
[92] *Id.* at 46-48.
[93] *Id.* at 47.
[94] *Id.* at 49.
[95] *Id.* at 49-50.
[96] *Id.* at 51.

chores around the house, including laundry, cooking, and cleaning.[97]  Plaintiff claimed

that she does not leave her home often due to either back pain or anxiety.[98]  She

spends most of her day either in bed or on the couch.[99]

### 2. Vocational Expert's Testimony

Testimony was provided at the hearing by vocational expert Ray O. Burger.[100]

Burger classified Plaintiff's past work history as a customer service worker as sedentary

work, as a cashier as light work, and as a warehouse worker as medium work.[101]  He

also addressed the hypothetical situations posed by the ALJ.[102]

The ALJ asked if an individual of Plaintiff's age, education, and same past work

experience, who retains an RFC (residual functioning capacity) for light work, but limited

to occasional climbing ramps or stairs, balancing, stooping, kneeling, crouching, or

crawling, could perform any past work.[103]  Burger testified that past work as a cashier

and in customer service could be performed.  The ALJ then added the limitation that

the individual could not climb ladders, ropes, or scaffolds.[104]  Burger testified that the

positions he mentioned as a cashier or in customer service would not be affected.[105]

The ALJ further added the restriction of occasional overhead reaching.[106]  Burger

confirmed that this limitation would not affect work positions of the individual in the

---

[97] Id. at 58.
[98] Id. at 57.
[99] Id.
[100] Id. at 68.
[101] Id. at 69.
[102] Id. at 69-71.
[103] Id.
[104] Id. at 69.
[105] Id. at 70.
[106] Id.

14

hypothetical.[107]

Thereafter ALJ modified hypothetical, where the individual was limited to only simple, routine and repetitive tasks with only brief and superficial interaction with the public and coworkers.[108] Burger testified that with this limitation, such an individual could not perform any past work.[109] However, when asked to identify any other jobs in the national economy that the individual in the hypothetical could perform, Burger stated other positions included those consistent with an inspector, a mail clerk, and a general office helper, and such jobs were considered light work.[110]

The ALJ's final question added the restrictions of lifting a maximum of ten pounds, and standing and walking for only a total of four hours out of an eight hour workday and whether these limitations would reduce position to a sedentary level.[111] Burger confirmed that they would and provided example sedentary jobs as an addressing clerk, a document clerk, and a small parts assembler.[112] Burger concluded that his testimony was consistent with the *Dictionary of Occupational Titles*.[113]

### 3. The ALJ's Findings

Based on the record evidence and testimony presented, the ALJ determined Plaintiff was not disabled and, thus, ineligible for either DIB or SSI.[114] The ALJ's findings are summarized as follows:

---

[107] *Id.*
[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] *Id.*
[113] *Id.*
[114] *Id.* at 28.

15

1. Plaintiff meets the insured status requirements of the Act through December 31, 2016.

2. Plaintiff has not engaged in substantial gainful activity since October 20, 2009, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. Plaintiff has the following severe impairments: degenerative disc disease, degenerative joint disease, anxiety, and affective disorder (20 CFR 404.1520(c) and 416.920(c).

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. From October 20, 2009, the alleged onset date, to October 12, 2015, Plaintiff had the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she could occasionally climb ramps/stairs; never climb ladders, ropes, and scaffolds and occasionally balance, stoop, kneel, crouch, and crawl. She was limited to simple, routine, repetitive tasks with only brief/superficial interaction with the public and coworkers.

6. Beginning October 13, 2015, Plaintiff had the RFC to lift and carry up to 10 pounds, stand and walk for 4 hours in an eight-hour day, occasionally climb ramps/stairs, never climb ladders, ropes, and scaffolds, occasionally balance, stoop, kneel, crouch, and crawl. She was limited simple, routine, repetitive tasks with only brief/superficial interaction with the public and coworkers.

7. Plaintiff is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8. Plaintiff was born on November 23, 1977 and was 31 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9. Plaintiff has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not plaintiff has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart

P, Appendix 2).

11. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 404.1569(a)).

12. Plaintiff has not been under a disability, as defined since October 20, 2009, through the date of decision (20 CFR 404.1520(g) and 416.920(g)).

Conclusively, the ALJ determined "based on the application for a period of

disability and disability benefits filed on July 31, 2013," Plaintiff was not disabled under

§§§ 216(l), 223(d), or 614(a)(3)(A) of the Act.[115]

## III. STANDARD OF REVIEW

### A. Motion for Summary Judgment

In determining the appropriateness of summary judgment, the court must "review

the record as a whole, 'draw[ing] all reasonable inferences in favor of the nonmoving

party[,]' but [refraining from] weighing the evidence or making credibility

determinations."[116] If there is no genuine issue as to any material fact and the movant

is entitled to judgment as a matter of law, summary judgment is appropriate.[117]

This standard does not change merely because there are cross-motions for

summary judgment.[118] Cross-motions for summary judgment

are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily

---

[115] *Id.* at 28.

[116] *Reeves v. Sanderson Plumbing, Prods., Inc.*, 530 U.S. 133, 150 (2000).

[117] *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(c)).

[118] *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

17

justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.[119]

"The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party."[120]

## B.    Court's Review of ALJ's Findings

Section 405(g) sets forth the standard of review of the ALJ's decision by the district court. The court may reverse the Commissioner's final determination only if the ALJ did not apply the proper legal standards, or the record did not include substantial evidence to support the ALJ's decision. The Commissioner's factual decisions are upheld if supported by substantial evidence.[121] Substantial evidence means less than a preponderance of the evidence, but more than a mere scintilla of evidence.[122] As the United States Supreme Court has found, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[123]

In determining whether substantial evidence supports the Commissioner's findings, the court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record.[124] The court's review is limited to the evidence that was actually presented to the ALJ.[125] The Third Circuit has explained that

---

[119] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

[120] *Krupa v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

[121] 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Medical Center v. Hecklem*, 806 F .2d 1185, 1190 (3d Cir. 1986).

[122] *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).

[123] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

[124] *Monsour*, 806 F.2d at 1190.

[125] *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001)

a: "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., evidence offered by treating physicians) or if it really constitutes not evidence but mere conclusion."[126] Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable.[127] Even if the court would have decided the case differently, it must defer to the ALJ and affirm the Commissioner's decision so long as that decision is supported by substantial evidence.[128]

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision.[129] In *Securities & Exchange Commission v. Chenery Corp.*,[130] the Supreme Court found that a "reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."[131] The Third Circuit has recognized the applicability of this finding in the Social

---

[126] *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

[127] *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

[128] *Monsour*, 806 F .2d at 1190-91.

[129] *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011).

[130] *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

[131] *Id.*

Security disability context.[132] Thus, this court's review is limited to the four corners of the ALJ's decision.[133]

## C. ALJ's Disability Determination Standard

The Supplemental Social Security Income (SSI) program was enacted in 1972 to assist "individuals who have attained the age of 65 or are blind or disabled" by setting a minimum income level for qualified individuals.[134] In order to establish SSI eligibility, a claimant bears the burden of proving that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of or not less than twelve months."[135] Moreover, "the physical or mental impairment or impairments must be of such severity that the claimant is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in significant numbers in the national economy."[136] Furthermore, a "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are evidenced by medically acceptable clinical and laboratory diagnostic techniques.[137]

---

[132] *Fargnoli v. Massanari*, 247 F.3d 34, 44, n.7 (3d Cir. 2001).

[133] *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D. Pa. 2005).

[134] *See Sullivan v. Zebley*, 493 U.S. 521, 524 (1990) (citing 42 U.S.C. § 1381 (1982 ed.)).

[135] 42 U.S.C. § 423(d)(1)(A).

[136] 42 U.S.C. § 423(d)(2)(A).

[137] 42 U.S.C. § 423(d)(3).

20

## 1. Five-Step Test

The Social Security Administration uses a five-step sequential claim evaluation

process to determine whether an individual is disabled.[138]

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. If a claimant is found to be engaged in substantial activity, the disability claim will be denied.
> In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that her impairments are 'severe', she is ineligible for disability benefits. In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work. If the claimant is unable to resume her former occupation, the evaluation moves to the final step.
> At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.[139]

If the ALJ determines that a claimant is disabled at any step in the sequence, the

analysis stops.[140]

---

[138] *See* 20 C.F.R. §416.920(a); *see also Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999).

[139] *Plummer*, 186 F.3d at 427.

[140] *See* 20 C.F.R § 404.1520(a)

## 2. Weight Afforded Treating Physicians

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight."[141] Yet such reports are only given controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record.[142] After considering all the evidence, the ALJ "may afford a treating physician's opinion more or less weight," provided he "give some reason for discounting the evidence [he] rejects."[143]

However, a statement by a treating source that a claimant is "disabled" is not a medical opinion; rather, it is an opinion on an issue reserved to the ALJ because it is a finding that is dispositive of the case.[144] Therefore, only the ALJ can make a disability determination.

## 3. Evaluation of Subjective Accounts of Pain[145]

Statements about the symptoms[146] alone never establish the existence of any impairment or disability. The Social Security Administration uses a two-step process to

---

[141] *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)

[142] *Fargnoli*, 247 F.3d at 43.

[143] *Plummer*, 186 F.3d 422 at 429; *see also Burnett v. Comm'r of Soc. Sec. Admin*, 220 F.3d 112 (3d Cir. 2000).

[144] *See* 20 C.F.R. § 416.927 (e)(1).

[145] *See* 20 C.F.R §§ 416.928-29. *See also* SSR 96-7p.

[146] A symptom is an individual's own description of physical or mental impairments such as pain, fatigue, shortness of breath and other complaints. *See* SSR 96-7p.

evaluate existence and severity of symptoms.

### a. Step One, Existence of Pain

First, the ALJ must find a medically determinable impairment – proven with medically acceptable clinical and laboratory diagnostic data – that could reasonably be expected to produce the claimant's symptoms. Otherwise, the ALJ cannot find the applicant disabled, no matter how genuine the symptoms appear to be.

This step does not consider the intensity, persistence and limiting effects of the symptoms on the claimant: it only verifies whether a medical condition exists that could objectively cause the existence of the symptom.

Analysis stops at this step where the objectively determinable impairment meets or medically equals one listed in 20 CFR Part 404, Subpart P, Appendix 1, because the claimant is considered disabled *per se*.

### b. Step Two, Severity of Pain

At step two, the ALJ must determine the extent to which the symptoms limit the claimant's ability to do basic work activities. Therefore, he must determine the applicant's credibility.[147]

At this step, the ALJ must consider the entire record, including medical signs, laboratory findings, the claimant's statements about symptoms, any other information provided by treating or examining physicians, psychiatrists and psychologists, and any

---

[147] Credibility is the extent to which the statements can be believed and accepted as true.

other relevant evidence in the record, such as the claimant's account of how the symptoms affect his activities of daily living and ability to work.[148]

Where more information is needed to assess a claimant's credibility, the ALJ must make every reasonable effort to obtain available information that would shed light on that issue. Therefore, the ALJ must consider the following factors relevant to symptoms, only when such additional information is needed:

(i) The applicant's account of daily activities;

(ii) The location, duration, frequency, and intensity of pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication the applicant takes or has taken to alleviate pain or other symptoms;

(v) Treatment, other than medication, the applicant receives or has received for relief of pain or other symptoms;

(vi) Any measures the applicant uses or has used to relieve pain or other symptoms (e.g., lying flat, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning functional limitations and restrictions due to pain or other symptoms.[149]

---

[148] *See* 20 C.F.R. § 404.1529.
[149] *See* 20 C.F.R. § 404.1529

### 4.    Factors in Evaluating Credibility[150]

A claimant's statements and reports from medical sources and other persons with regard to the seven factors noted above, along with any other relevant information in the record, provide the ALJ with an overview of the subjective complaints, and are elements to the determination of credibility.

Consistency with the record, particularly medical findings, supports a claimant's credibility.  Since the effects of symptoms can often be clinically observed, when present, they tend to lend credibility to a claimant's allegations.  Therefore, the adjudicator should review and consider any available objective medical evidence concerning the intensity and persistence of pain or other symptoms in evaluating the claimant's statements.

Persistent attempts to obtain pain relief, increasing medications, trials of different types of treatment, referrals to specialists, or changing treatment sources may indicate that the symptoms are a source of distress and generally support a claimant's allegations.  An applicant's claims, however, may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show noncompliance with prescribed treatment.

Findings of fact by state agency medical and psychological consultants and other physicians and psychologists regarding the existence and severity of impairments and symptoms, and opinions of non-examining physicians and psychologist are also part of

---

[150] *See* SSR 96-7p.

the analysis. Such opinions are not given controlling weight. However, the ALJ, although not bound by such findings, may not ignore them and must explain the weight afforded those opinions in his decision.

Credibility is one element in determining disability. The ALJ must apply his finding on credibility in step two of the five-step disability determination process, and may use it at each subsequent step.

The decision must clearly explain, that is, provide sufficiently specific reasons based on the record, to the claimant and any subsequent reviewers, regarding the weight afforded to the claimant's statements and the reasons therefore.

The law recognizes that the claimant's work history should be considered when evaluating the credibility of her testimony or statements.[151] A claimant's testimony is accorded substantial credibility when he has a long work history, if it is unlikely that, absent pain, he would have ended employment.[152]

### 5. Medical Expert Testimony

The onset date of disability is determined from the medical records and reports and other similar evidence, which requires the ALJ to apply informed judgment.[153] At the hearing, the ALJ should call on the services of a medical advisor when onset must

---

[151] See 20 C.F.R. § 404.1529(a)(3)

[152] See Podedworny v. Harris, 745 F.2d 210, 217 (3d Cir. 1984) citing Taybron v. Harris, 667 F.2d 412, 415 n.6 (3d Cir. 1981). In Podedworny, the claimant worked for thirty-two years as a crane operator for one company. He had a ninth grade education and left his employment after the company physicians determined that his symptoms of dizziness and blurred vision prevented him from safely performing his job.

[153] See SSR 83-20.

be inferred.[154]

## IV. DISCUSSION

### A. Parties' Contentions

In her appeal, Plaintiff argues (1) the opinions of ALL treating physicians establish greater limitations than found in the ALJ's RFC, and (2) the ALJ accepted but then excluded limitations from the opinions of the Agency's medical consultants and psychological consultative examiner without explanation.[155] Plaintiff contends that the ALJ's RFC does not describe with specificity all of the practical effects of all of her demonstrated impairments, and as such, the vocational testimony based upon the inaccurate RFC cannot, as a matter of law, be substantial evidence supporting the ALJ's denial of benefits.[156]

Alternatively, Defendant maintains that the ALJ thoroughly evaluated the objective medical and opinion evidence, and that there was substantial evidence to support his determination that Plaintiff retained the ability to perform a limited range of work.[157] Defendant further contends that Plaintiff's anxiety and affective disorders were ameliorated with medication, and she had largely normal mental status examinations.[158]

---

[154] *Id.*
[155] D.I. 18 at 2.
[156] *Id.* at 6.
[157] D.I. 20 at 2.
[158] *Id.* at 7.

## B. Disability Analysis

Title II of the Social Security Act, 42 U.S.C. § 423(a)(l)(D), "provides for the payment of insurance benefits" to those who contributed to the program and suffer from a physical or mental disability.[159] In order to qualify for disability insurance benefits, a claimant must establish she was disabled prior to the date she was last insured.[157] A "disability" is defined as the inability to do any substantial gainful activity because of any medically determinable physical or mental impairment, which either could result in death or has lasted or can be expected to last for a continuous period of at least 12 months.[158]

To be disabled, the severity of the impairment must prevent return to previous work, and considering age, education, and work experience, restrict "any other kind of substantial gainful work which exists in the national economy."[159]

As noted previously, in determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis[160]. If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner does not review the claim further.[161]

---

[159] *Bowen,* 482 U.S. at 140.
[157] 20 C.F.R. § 404.131.
[158] 42 U.S.C. §§ 423(d)(l)(A), 1382(c)(a)(3).
[159] 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).
[160] 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).
[161] 20 C.F.R. § 404.1520(a)(4).

When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled.[162] If a claimant's impairments, either singularly or in combination, fail to meet or medically equal any listing, the analysis continues.[163] In the analysis through the five steps, the Commissioner determines whether the claimant retains the RFC to perform her past relevant work.[164] A claimant's RFC is "that which an individual is still able to do despite the limitations caused by [her] impairment(s)."[165]

If the claimant is unable to return to her past relevant work, the Commissioner then determines whether the claimant's impairments preclude adjusting to any other available work.[166] At this final step, the burden is on the Commissioner to show the claimant is capable of performing other available work existing in significant national numbers and consistent with the claimant's medical impairments, age, education, past work experience, and RFC before denying disability benefits.[167] In making this determination, the ALJ must analyze the cumulative effect of all the claimant's impairments, often through the assistance of a vocational expert.

### 1. Weight Accorded to Opinion Evidence

In weighing medical opinion evidence, the ALJ considers the entire evidentiary record as whole. If a treating source's medical opinion is well-supported by "medically

---

[162] 20 C.F.R. § 404.1520(a)(4)(iii).

[163] 20 C.F.R. § 404.1520(e).

[164] 20 C.F.R. § 404.1520(a)(4)(iv); *see also Plummer*, 186 F.3d at 428.

[165] *Fargnoli*, 247 F.3d at 40.

[166] 20 C.F.R. § 404.1520(g) (mandatory finding of non-disability when claimant can adjust to other work); *see also Plummer*, 186 F.3d at 428.

[167] *Id.*

29

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, it will be given controlling weight.[168] If not given controlling weight, the ALJ must explain his reasons for the weight given to the medical opinion evidence.[169] Plaintiff in this case argues the opinions of her treating physicians establish greater limitations than set forth in the RFC, and the ALJ's evaluation of the opinion evidence is insufficient as a matter of law. The court finds proper weight was accorded to all medical opinions, and there is substantial evidence that supports this decision.

### a. Treating Physicians

The ALJ considered the assessments provided by: Dr. Moran, Physiatrist (Surgeon); Dr. Moutsatsos, Primary Care Physician; Dr. Patel, Anesthesiology and Pain Management; Edwin Buenaseda, Physical Therapist, and Dr. Bose, Neurosurgery.[170]

### I. Dr. Moran, Physiatrist (Surgeon)

The ALJ accorded Dr. Moran's opinion no weight when he opined that Plaintiff could not return to work between January 2010 and April 2010, and between August 2010 to December 2010.[171] The issue of whether a claimant is disabled and unable to work is a determination reserved to the Commissioner.[172] Dr. Moran's opinions were based on Plaintiff not returning to her then-current job, which was classified as a medium job.[173] The ALJ determined that Plaintiff had the RFC to perform sedentary

---

[169] See supra Part III (C)(2).
[170] D.I. 15-2 at 15-28.
[171] D.I. 16-13 at 869, 870, 872, 876, 877, 879, 882.
[172] 20 C.F.R. 416.927(d)(1).
[173] Id.

work, which was not addressed in Dr. Moran's opinion. Further, Dr. Moran agreed Plaintiff should pursue different employment, stating it would be "prudent."[174] The court notes that Dr. Moran's office visit record from 5/24/13 provides that Plaintiff' symptoms started with a motor vehicle accident in 2001, and a few weeks later bilateral low back pain radiating into her left buttock and left foot numbness developed.[175] However, during the hearing, Plaintiff testified that "the only . . . injury I ever had was a car accident when I was a teenager, but . . . I didn't start having problems with my back until my twenties."[176] This testimony is inconsistent with Dr. Moran's medical records. The court finds that the ALJ properly considered and gave Dr. Moran's medical opinion the correct weight in rendering his decision.

### ii. Dr. Moutsatsos, Primary Care Physician

The ALJ afforded Dr. Moutsatsos' opinion light weight for being "overly restrictive" as compared to other objective medical evidence.[177] She opined Plaintiff was unable to climb, balance, stoop, kneel, or crouch and was limited to lifting 5 pounds, sitting 4 hours total, but no more than 1-2 hours at a time, and walking less than 100 feet.[178] This opinion is inconsistent with other treating physicians' opinions, namely Dr. Patel, who specializes in pain management. This court finds that the ALJ properly considered and gave Dr. Moutsatsos's medical opinion the appropriate weight in rendering his decision.

---

[174] *Id.* at 871.
[175] D.I. 15-12 at 596.
[176] D.I. 16-2 at 63.
[177] D.I. 15-2 at 26.
[178] D.I. 15-15 at 862-63.

31

### iii. Dr. Patel, Anesthesiology and Pain Management

The ALJ accorded Dr. Patel's medical opinion great weight regarding Plaintiff's
ability to perform sedentary work, which Dr. Patel opined she could. There are two
opinions from Dr. Patel, one completed in November 2015, and the second in
November 2016, in which Dr. Patel stated Plaintiff could sit for two hours at a time, up
to 4.5 hours total, and stand for up to thirty minutes at a time, up to 1.5 hours total. The
opinion in November 2016 shows improvement in Plaintiff's work-related capabilities.
The ALJ rejected that Plaintiff would miss up to two days of work per month, because
this finding was inconsistent with other medical evidence in the record. The court finds
that the ALJ gave Dr. Patel's opinion the proper consideration and weight in rendering
his decision.

### iv. Edwin Buenaseda, Physical Therapist

The ALJ gave no weight to Plaintiff's physical therapist assessment/opinion.
Plaintiff began seeing Edwin Buenaseda on January 24, 2017. She then visited him
again on January 26, 2017. Ten days later, after only treating Plaintiff twice, he
completed a physical abilities assessment, stating that she could not work at all. For
work postures/tolerances he concluded Plaintiff was unable to bend, turn, twist, kneel,
crawl, or climb.[179] He further determined she could occasionally sit, walk, squat, drive,
and stand, and could frequently perform repeated arm and wrists/hands motions, reach
above her shoulders, and operate foot controls.[180] The court finds the ALJ was properly
within his discretion to reject Buenaseda's assessment and opinion.

---

[179] *Id.* at 854.
[180] *Id.*

### v. Dr. Bose, M.D. (Neurosurgery)

The ALJ afforded Dr. Bose's opinion great weight concerning Plaintiff's sedentary RFC. The ALJ found no record support that Plaintiff would miss more than four days of work per month. Plaintiff had four office visits with Dr. Bose from November 2015 to January 2017, during which time she had the recommended back surgery scheduled and completed in May 2017.[181] The court finds that the ALJ afforded Dr. Bose's opinion the correct weight in his decision.

### b. State Agency Consults

The ALJ considered the opinions of State Agency consultants Henry Scovern, M.D., Josette Covington, M.D., Pedro Saez, Ph.D., and Byron Pack, Psy.D.[182] The ALJ gave great weight to the opinions of Drs. Scovern and Pac. Although Dr. Scovern did not meet with Plaintiff, he performed an initial evaluation after a review of the record.[183] He opined that Plaintiff could perform light work, occasionally balance, stoop, kneel, crouch, and crawl, and reach overhead bilaterally.[184] Dr. Scovern noted that there were, "no significant deficits on physical examinations to warrant more restrictions than a light residual functional capacity."[185] Dr. Pack also provided an assessment for the Agency at the initial level, opining that Plaintiff could understand, retain, and carry out simple instructions, and consistently and usually perform routine tasks on a sustained basis with minimal (normal) supervision.[186] He found Plaintiff could also effectively cooperate

---

[181] D.I. 15-2 at 43.
[182] *Id.* at 23.
[183] *Id.*
[184] *Id.*
[185] *Id.*
[186] *Id.*

33

with the public and coworkers in completing simple tasks and transactions.[187] The ALJ

gave this opinion great weight, stating that Plaintiff's memory is routinely intact and she

is able to sustain attention.[188] This opinion conflicts with that of Dr. Saez, who also

performed an assessment for the Agency, and found that Plaintiff had restrictions of

daily living, deterioration of personal habits, constriction of interests, was moderately

limited in relating to others, carrying out instructions, sustaining work performance, and

coping with the pressures of ordinary work.[189] The ALJ afforded Dr. Saez's opinion

some weight.[190] The court finds that the ALJ properly weighed the opinions of Drs.

Scovern, Pack and Saez.

The ALJ gave Dr. Covington's opinion partial weight because she only examined

Plaintiff once, and the ALJ noted that there was no consideration given to Plaintiff's

neck and back problems in the assessment, which would prevent medium RFC work.[191]

The court finds the ALJ afforded Dr. Covington's opinion the appropriate weight and

consideration.

### 2.    The ALJ's RFC Assessment

Plaintiff alleges the ALJ failed to address that treating physicians' opinions

established greater limitations than found in the ALJ's RFC finding and the omission of

those demonstrated limitations.[192]

An RFC is an individual's ability to perform in a work setting despite impairments

---

[187] *Id.*
[188] *Id.*
[189] *Id.*
[190] *Id.*
[191] *Id.*
[192] D.I. 18 at 2.

and limitations.[193]  In making this finding, the ALJ must consider all of the claimant's impairments, including those that are non-severe.  Although the ALJ may weigh the credibility of the evidence, he must indicate the evidence which he rejects and his reason(s) for discounting such evidence.[194]

In the current matter, the ALJ found Plaintiff is capable of performing sedentary work as an addressing clerk, a document clerk, and a small parts assembler, and this work does not require the performance of work-related activities precluded by her RFC. The ALJ specifically found that plaintiff's treatment records to be generally consistent with her medically determinable impairments, but inconsistent with her subjective reports of disabling symptoms, which suggest that her symptoms are not as severe as alleged.[195]  The medical evidence failed to indicate that Plaintiff experiences symptoms that cause work-related functional limitations beyond those stated in the RFC.

Despite medication, Plaintiff has functional limitations due to degenerative joint disease, degenerative disc disease, anxiety, and affective disorder.[196]  The evidence, however, shows that she retains the functional abilities to perform work at the sedentary level with postural limitations.  Additionally, the ALJ found, given Plaintiff's age, education, work experience, and residual functional capacity, that she is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.[197]

---

[193] 20 C.F.R. § 404.1545.
[194] *Plummer,* 186 F.3d at 429.
[195] D.I. 15-2 at 22.
[196] *Id.* at 24.
[197] *Id.* at 28.

The ALJ found that despite providing Plaintiff with every benefit of the doubt in her favor, and crediting her testimony that was consistent with the medical evidence, her allegations regarding functional limitations were unsupported by the record.[198] The record lacks substantial evidence showing she is significantly limited, suggesting her limitations are not as severe as reported.[199] This court finds after fully considering the record, including medical opinion evidence and statements by Plaintiff, that the ALJ properly concluded that her RFC adequately accounts for her present capacity.

## V.   CONCLUSION

Therefore, Plaintiff's Motion for Summary Judgement (D.I. 17) is denied; and Defendant's Motion for Summary Judgement (D.I. 19) is granted.  An order consistent with the findings in this Memorandum shall follow.

Date: July 24, 2019.                          /s/ Mary Pat Thynge
                                              Chief U.S. Magistrate Judge

---

[198] *Id.* at 25.
[199] *Id.* at 22.